May I proceed? Good morning, your honors. Gerald Shelley, Fenimore Craig, Phoenix, Arizona, on behalf of Wells Fargo Bank. May it please the court I would like to reserve five minutes. Manage your own time. Thank you. This case results from in two key issues where corners were cut in order to get to plan confirmation. The first issue turns on ignoring otherwise valid claims and how they should be treated and the second reduces the issue of feasibility to a mere test of whether the math adds up. In both instances the law set forth in the bankruptcy code and case law requires more and for these reasons we seek reversal and remand for proper application of the law. To start the first issue has to do with an 1111B election that was made. There were a number of properties in this case. Wells Fargo Bank had a lien against one called Suarita. The Suarita property had dropped dramatically in value after the real estate crisis of 2008 and that set up a situation where you would see cram down under a plan. In order to avoid the full effect of cram down, the bankruptcy code gives a lender the right to make that 1111B election. The bank made that election in that instance and what that did of course was it calls them for the payment of principal over some period of time that is governed by some bankruptcy code rules and we are well into that. The problem is that the third-party guarantors also became joint debtors in this large bankruptcy case and under the guarantees that were signed pre-petition there was a waiver of any ability to, of any defense against spillover claims from an 1111B election. So to put it really specifically, there would be a deficiency created by an 1111B election in a bankruptcy case and nobody is going to dispute that if the guarantor is outside of bankruptcy that the guarantor would have to deal with that deficiency. In this case, the guarantor... be liable for it. In this case, and that's pretty well-established law, that's section 523E and goes back to a number of cases having to do with third-party guarantor liability that this court has dealt with over the years that we've cited in our briefs. What this case presents that's new is now you have the third-party guarantor debtor who is joined not by substantive consolidation but by just administrative consolidation into the bankruptcy. And then you have one plan that deals with all of the individual debtors and their assets. Our view, the bank's view, is whatever the deficiency is, and by some calculations it could be in the millions of dollars, the deficiency from the 1111B election in Suarita, for example, needs to spill over into the unsecured pools of claims that the individual guarantors have to deal with. What happened here basically was the bankruptcy judge said, and I can cite you to the record, she said, I agree with you that if the debtors, if the guarantors are not in bankruptcy, they would have to treat and pay the deficiency claims. But they're in bankruptcy and that's different. There's no basis under the code, there's no basis under the case law that would suggest that just because the guarantors happen to be in bankruptcy that the deficiency claim from an 1111B election evaporates, just disappears. It has to be treated. That's one of the fundamental principles of bankruptcy. You can't just, particularly in a case like this where the third-party debtor guarantors were also the owners and they were going to hold on to all of the equity of the assets, so under the absolute priority rule they had an obligation to pay all of their creditors a hundred cents on the dollar. That would mean that the deficiency claim from the 1111B election on Suarita spills over into one of the cups and has to be dealt with by the guarantors in their bankruptcy case in one fashion or another. Here again, as we've said, the guarantors said no, it's different because they're in bankruptcy and those claims were given no treatment at all. So we're asking for a remand back to the bankruptcy court to say, no wait a minute, you must determine the amount of the deficiency and that deficiency must be an allowed claim that the guarantors have to pay. So when you filed a claim against in the bankruptcy for the deficiency, did you quantify the amount you were seeking against the deficiency? In some ways we did, in other ways it was speculative. Right, so I mean let's assume it's remanded, how would you propose to calculate the deficiency, which we don't know how much it's going to be, right? Well, that gets into the difference between the two elections here, but I'll answer your question directly and then maybe go on to that that will help. No, I'm just saying that you have initially a cram down to get the loan value equal to the amount of the asset. The 1111B election then lets you say, no, no, no, we get to pay, we get the full principle but over some lengthy period of time, but you get the principle without interest. Right, I understand all that, I'm just saying what's your deficiency claim, can you quantify it at this point? The answer is yes, that interest that would have been received is around $950,000 on Suarita. Now let's go to the second type of election. There was also a provision called alternative treatment that was offered with regard to a different asset. This asset was Grant Road or it's called La Mirada, that's an apartment complex, and instead of creating a situation where the 1111B election would come in there, the debtor simply said, look, we will pay the bank a half a million dollars in return for a three million dollar debt reduction. And the bank made that election. And then there was some dispute that you see in the briefs about whether we should have filed the Rule 60 motion to have it reconsidered and we didn't. The truth is the bank took a look at that and said, we'll live with the consequences, we will take the cash, and if the deficiency is then that's what we ought to be seeking and that's what we're seeking here today. That deficiency, to answer your question, your honor, is about $2.5 million. So we're probably looking at somewhere between three and a half to four million dollars of deficiencies that just went up in smoke in order to cut the corner to get the plan confirmed. Okay, I think Judge Kuczynski had a question. This is sort of a zero-sum game in a way, because all the parties, all the debtors are the same parties, right? Correct. And so I'm having a little difficulty figuring out, let's say the bank's record had done as you say that it should have. And the guarantors were liable on the deficiency. Where does that money come from? Well, the guarantors get to continue to own these real estate assets. And so long as they make their payments under the plan, the required payments, they get whatever profits exist. So you want to be treated the same as other unsecured creditors? Correct. For the amount. What happened to the other unsecured creditors? There were other unsecured creditors, and according to the plan, they're going to be paid a hundred cents on the dollar over time. And so those claims are being paid. We simply want to take our deficiency on Swarita and participate in the same way as those what we think similarly situated claimants. What it really boils down to is off the profits of the real estate, does the bank get its unsecured claim, or do the owners get those profits? And as I understand it, the individual debtors are themselves unsecured creditors. The individual debtors are unsecured creditors of some of the other entities. Right. I think that's correct, and I can't tell you... So that they benefit from this arrangement to the extent that your client is disadvantaged. If what you say is correct, and I have every reason to believe it is, that is a correct statement, but it's something that the opposing counsel perhaps ought to confirm. You're down to about five minutes. Do you want to reserve? Yeah, thank you for that. So, I mean, that's our concern, that these deficiencies can't just be ignored. They can't just go up in smoke. They can't just disappear. They have to be dealt with, and they have to be dealt with in a way that's fair and equitable with similarly situated claims. The second issue that we have, and I'll address it for about a minute, then sit down, has to do with feasibility, and it's back on the Suareta case also. This is a case where it is a mini storage unit, and typically you see loans on these types of units, commercial loans, either seven years with a balloon, or maybe they're amortized over ten years. This one, in income streams work in order to show feasibility, they have to stretch it out to 25 years. That's not a huge surprise in a bankruptcy case. There have even been cases where you see 40 years. It depends on the type of asset in the market, but we think 25 years is too long to be feasible, but the big problem is that the monthly payments on the mortgage more than triple from the 25, you have this more than tripled amount. Now, there is the prospect, and I think maybe some additional work has been done to put more mini storage units there, and that maybe could show some income rise, but there was no basis at all to say, hey, we expect that in the 20th year we're going to be able to triple our income. The evidence showed that they were making around four or five thousand dollars a month, and they had to start with six thousand dollar a month payments, and when they get to the year 21 through 25, now they've got to make twenty thousand dollar a month payments. We think that that's just way outside the parameters of what would be feasible in the tests that courts apply, and we think it ought to be remanded with a finding that that's an unreasonable stretch on feasibility, and there ought to be something more specific. I'll reserve the last three minutes. Thank you, counsel. Thank you. May it please the court, my name is Fred Peterson from Mesh Clark and Rothschild in Tucson, Arizona. I represent nine joint debtors who are proponents of a joint plan of reorganization confirmed by the Bankruptcy Court in September of 2011. Four of those entities are important for this appeal, although the relief requested by Wells Fargo to set aside the confirmation order would no doubt affect all of those debtors. The four that are affected are Sarita Self Storage Associates, 4415 East Grant Road, which at times is referred to in the record as Grant Road, at times is by the name of the apartment complex, which was La Vista Apartments, Chris and Irene Monson. The confirmed joint plan resolves claims for the eight entities and the two individuals I mentioned above, addressing over 75 classes of claims, eight institutional lenders and scores of vendors and taxing authorities. Every payment due under that plan in the last almost six years has been timely made. Well, no wonder they got to extinguish those debts. Of course they can pay everybody off. Well, so what should address opposing counsel's argument that the guarantees were extinguished without any payment? Your Honor, we disagree. There was no extinguishment of the debt. There was an election by Wells Fargo for the treatment that they received. They've been paid pursuant to their election, and the effect of that is that they are being I'm sorry. Against what? The election was what? Well, so we can take the two situations where there was an election. In the Grant Road case, they were offered options A, B, and C. Certainly in a bankruptcy case, the traditional cram-down where I can force or the court can force against their will certain treatment, that was one of the options. They could have chosen that, but instead they chose treatment where they got well more than they would have gotten otherwise in a cram-down. They got an immediate payment. There was a loan that improved their collateral. All they want is a deficiency, and they want the difference between what they got and what they should have gotten under their guarantee as an unsecured creditor. That's what they want, but what they chose was, I'm going to get paid more now. In exchange for that, I'm not going to pursue the guarantor. I'm not going to pursue them against the debtor. Doesn't mean I'm not going to pursue them against the guarantor. Where does that come from? I mean, that's why you have guarantors, because debtors go belly-up, and you then have this other person that you can go after for what the debtor doesn't pay. But we are in a joint plan situation. There's one claim. So what? So what? The debtor is a debtor. The debtor, you know, you make an election against the debtor. You still have claims against other people who own the debt. If this had been somebody outside the bankruptcy, there's no doubt they could have gone after the guarantor outside the bankruptcy, right? Unless they elected not to pursue that guarantor, certainly. But they in this joint plan... I'm sorry. What do you mean, unless they elected not to pursue that guarantor? We're in bankruptcy. There was an election, a crammed-out election, and there was a guarantor outside of bankruptcy. So you, I said, they would be able to go after that person. And you said, unless they elect not to. Where would they elect not to? Well, you're asking a hypothetical. Of course I'm sorry. You didn't think I knew that? I'm, I have confirmed bankruptcy plans where secured creditors... I don't care about what you, I don't care, I don't care what you've done. I want you to answer my question. Do you understand my question? I understood your question. Okay, so why don't you answer that one? If they elected not to pursue the guarantor, then they could not. They would be bound by their election, which is exactly what happened here. Okay, let me ask the question one more time. I'll give you a chance to answer it. If you don't answer it, I will just simply accept that you don't have a good answer. They are in a crammed-out situation with a debtor, with a guarantor outside of bankruptcy. They make an election in the bankruptcy involving the debtor. Okay, can they still go after the guarantor? One, this is not a crammed-out situation. This was an election, right? So let's say it's exactly the situation, except you have a, you have a guarantor outside of bankruptcy. Depends on the terms of the election. In this case, the election said if you elect this, you do not get to pursue the guarantor. That was the treatment they... I thought the election was a statutory mechanism. There are two cases. So one is the 1111B and one is the Grant Road case. So I was, I was addressing the Grant Road case. If you want to address the statutory election, 1111B... Let's talk about the statutory election. Okay, the statutory election, they elected that that treatment, there's one claim in the joint case, would get treated in full in one class. There's nothing by definition that could be in the guarantor case because it's one claim in the bankruptcy. I understand. I mean, there's one claim in the bankruptcy, but you still have your guarantor who's outside the bankruptcy. Is there anything that would preclude them from going after the guarantor outside the bankruptcy? The difference outside of bankruptcy is that... No, no, I'm asking that question. You may think it's different, but I'm asking... Yes, they could. Okay. And can I, may I explain the reason why that's different? The reason why it's different is outside of bankruptcy, you don't have the automatic stay. Interest continues to run against those parties. Their assets aren't being administered by the joint plan. There aren't the source of funds. The question you asked before was a good one. This was one enterprise. These weren't debtors who had different jobs or different assets. Their whole world was in this bankruptcy. Every one of their businesses, every one of their assets. The only source of funds to repay creditors was the operating entities. If there was anything left from that, it would pour to Aberdeen, and then it would eventually pour to... But so what? So what? I don't understand. If they make an election that does not carry a waiver of their claims against the guarantor, I don't see why any of that makes a difference. Where is there a waiver under either election? Where's a waiver against the guarantors? In the Grant Road election, the court clearly... Why don't you, let's look at the record. Sure. Point me to where it is. So in the Grant Road case, there was no dispute that by the end, the court and the parties... No, no. Tell me where. Where? I'm sorry. Where there is an election in the record. I have the record. I have excerpts right here. So you just give me a page. The only place the election is in our supplemental authority, which is our ballot report, which identifies the election that they made. I want a volume and page number. Their election is referenced in the supplemental... What do you mean by referenced? Where is the election? Their actual election was the ballot that they put on appeal. The ballot is not filed with the bankruptcy court. It is submitted to counsel. So how can whatever is in the ballot be an election if it's not filed with the court? Because counsel then certifies ballots in a ballot report. And what is it? The ballot report is in the supplemental excerpt of the record. Okay. Supplemental excerpt of the record? On what page? It's referenced on... It's referenced on page 13. The supplemental excerpt of the record? There's a footnote that says... These are the numbers in the... Okay. I'm looking at 13. Where? Referenced to Class 42 Wells Fargo Bank. And there's a footnote which references a elected allowance option A under item B. Which footnote? It's footnote 1. Okay. So that doesn't say anything about any waiver? Well, it says they elected allowance option A under item 2 of the ballot. Again, I'm not understanding. Where's their waiver? What does the ballot say? The ballot says they elected that class. And the effect of that in the plan... And they waived claims against the guarantors? The terms of the plan, they were waiving the guarantors. They were agreeing only to pursue claims in that class because they were getting more in that class than they would have otherwise gotten in a crammed down and seeking... I'm saying this was a plan that covered all the debtors? Correct. One joint plan for nine debtors and 75 classes. Okay. And do you have a copy of the ballot? The ballot? Well, this thing you're The effect of the waiver is defined in the plan and it's defined... Okay, where in the plan is it? It's in the plan. I apologize. It's in the record, page 665. I think it's important for this court, there's no doubt that this was the understanding of the But it's a factual determination by the court of that was the interpretation of this plan. Right, but there's no reference in the plan to the guarantee, is there? There's a separate class for the guarantee, but the reference in the claim in the plan talks about the effect of this, was it that the claim would be not in default, it would be deemed current, and all the payments in this class would satisfy the Wells Fargo claims. I'm at 665. What do you see here? I was just reading, I'm sorry. I think it's 654. 66. Okay. What line? Line 20. And where does it say that this extinguishes the debt, the obligation of the guarantors? It didn't extinguish the debt. It was, you have to look at the plan as a whole. This in combination with the treatment of the guarantees, with the understanding of the parties, you had a five days of confirmation trial that it was clear from everyone involved that this was the effect of it. And that's why by the end, Wells Fargo stood up and said, we made a mistake. We didn't mean our election to mean that. And the result for that, that's, we made a mistake is a Rule 60 issue. That's not an issue on appeal. So they said we made a mistake? They said we made a mistake. Where's that? That's throughout the record. Just give me one. Okay. If you look in the transcript from pages like 1505 to 1521, there's extensive discussion about their election, what the trial court characterized as unringing the bell. They were trying to change their election. I'm sorry, that's the bankruptcy court's characterization. They characterized it when Wells Fargo said, we want to change our election. They said, you'd be unringing the bell. You'd be making a substantial change that affects. Where do they do that? It's in, there's a substantial discussion in pages 1505 to 1521. No, that's the bankruptcy court's order. Okay. I'm looking at 1505. It's a transcript of the confirmation. I'm seeing. Okay. So where? Okay. Perhaps the best place to look is the very end, 1521. After a series of discussions, Mr. Shelley tells the court, I think it's late. You've done a good job narrowing the issues. If we unring the bell, I think the plan has to, they have to take a second look at it. I remind Your Honor, it's their plan. They wrote it. If it's ambiguous, it ought to be taken into account. We think it was. I think we'll be back filing the appropriate pleading of Rule 60. Yeah, but they say they had nothing. It didn't matter what they, whether they changed it or not. There were, there was nothing that would have helped them. It absolutely would have helped them. This discussion demonstrates if they follow Rule 16 are successful that we have to. No, they, they realized afterwards that that statement was, was a mistake and a fact that there was no election that they could make that would have benefited them. And, and, and I, I disagree with that. I think that is just a statement without a warrant. The truth is, if you look at the claims that they filed, the claims they filed are treated in full under this joint plan. And this election is the fact of this case, that the claims were allowed at zero by the court. Their claim that you need to remand for determination of the amount of the claims, the claims have already been determined to be zero by the bankruptcy court. And they should be bound by their election. They've ratified the treatment by accepting the payments for the six years. And, and they need to be held to that. What do you make of the fact that there was no substantive consolidation in this case? There's a motion for joint administration.  There was not. I don't think it changes the outcome of this case. Wells Fargo in a joint plan still made an election. There's nothing that prohibits a bankruptcy court to, in effect, do marshalling of assets. But it does require, if you're going to have a joint plan that affects debts across the board, don't you have to have a substantive consolidation rather than a procedural consolidation? Um, you don't if they elect the treatment that Wells Fargo did in this case. Well, it does make a difference because they elected it in one, theoretically, in one bankruptcy and not in another. But they were never substantively consolidated. If I think your, I think your argument might be stronger if they, if it had been. Perhaps it would, but I don't think it's fatal to this case. They still made an election pursuant to a joint plan. And you look at the plan as a whole of whether it's confirmable, whether legal error has been made. And you look at the Wells Fargo claims as a whole of whether they're being paid. They're being paid every dollar they're entitled to pursuant to their election. Their choice that led through the confirmation hearing, their failure to file the Rule 60 motion to correct what they claim is their mistake, means you and this record on appeal before you today, they can't say we have a deficiency claim. They can't say we might have a deficiency claim. The record before this court is that there is no deficiency claim. The court allowed them at zero based on their elections. And on that record, factually, is there an error at law in confirming the plan? Absolutely not. Okay. I'm out of time. I just resubmit as we put in our briefs, our feasibility arguments, which are factual issues and the ratification issue, which I think is important. Thank you, Your Honor. Okay. Thank you. If I may, Your Honors, let me address that issue of mistake. Here's what happened. Remember, there's the 1111B election, that's statute. Then they came up with their own, if you elect to take $500,000, you'll reduce your claim by $3 million. We made both of those elections. But they're fundamentally different in the sense that one was one that they came up with and the other one is statutory. Mr. Peterson is referring, when he talks about the mistake, when we got to the final hearing, the debtor indicated, oh, that plan election means that you're waiving your deficiency against this other debtor, the guarantor debtor. And we said, well, no, we made the election. It doesn't say anything in the plan itself, the bankruptcy plan, that if we make the plan election that we have waived the deficiency. It's silent on that. So when the debtor comes and says in open court, yeah, but that's what it means. We said, well, that's not why we chose it. We didn't understand that was the consequence. So it's almost like a matter of contract law where it's not clear and somebody has to decide what the contract really says. The two ships fearless? Pardon me? The two ships fearless? Yes, sir. Yes, sir. And so we said, well, all right, if that's what it means, we may go ahead and make a rule 60 motion to unring the bell or pull our election. We took a step back and we said, no, we're not going to do that. We don't think it eliminated the deficiency. The debtor may think it eliminated the deficiency. I gather what their argument is, is that when you elected and said that the debt was essentially current and unsatisfied, that that was tantamount to an extinguishment of the guarantee. That's the argument, I gather. That's the argument. But again, I'll call you back to page five of our opening brief where we put the language from the guarantees long before the bankruptcy was ever filed. There's very specific guarantee language that says, guarantor waives and has A, B, C, D, E, G, any defense based on lender's election, dot, dot, dot, under section 1111B2. So they waived any defense that that deficiency didn't continue over. That was waived. We think it's applicable to both elections. I will admit on the record, it's a stronger argument under 1111B2, but it's equally, it's also strong under the plan election because there's nothing, they controlled that language. They controlled the plan. They put it in there. It doesn't say in their plan election. This eliminates the deficiency liability as against the guarantors. It's not in there. Was this, in fact, a joint plan? Correct. It was a joint plan. It was a joint plan, but not substantially consolidated. It was several administratively consolidated debtors that were put in one plan. It was clever legal work. It was well done in that regard. It just didn't, in our estimation, as a matter of law, allow for or cause the deficiency dollars to just evaporate. You have to deal with the claim. It has to go somewhere. It's like squeezing a balloon. That air's got to go somewhere. And in our estimation, it has to participate in the same way as similarly situated unsecured claims. A couple more points. So we have a final day of oral argument. The bankruptcy judge said when she was confronted with this question, she said, outside of bankruptcy, I think you're right. Inside of bankruptcy, I think you're wrong. So on swerita, we're done. That's the problem that we have. Nobody disagrees that if the guarantors are outside of bankruptcy, there's no issue here. You put them inside bankruptcy and a separate bankruptcy, an administratively consolidated bankruptcy, what's the authority that says that the deficiency debt disappears? I think his argument is that if you take the language that they propose, that might have the effect of extinguishing a non-bankruptcy guarantor. And whether that's where that takes us, I don't know. But I think that's the argument he's trying to make. It seems to me that's the argument that if the debtor thinks that it must be so. I think that's... No, just what is the effect of the language? It all comes down to that. I think that's correct, Your Honor. You're over your time. I am. Thank you very much. I appreciate the opportunity. Thank you both for your arguments. Case just argued to be submitted for decision.
judges: Kozinski, Thomas, Korman